FILED

2005 Oct-14  PM 12:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

05 OCT 11  PM 4:09

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **JOHN SWIFT, and BERTRAM LEE,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | |
| **PIKE ELECTRIC, INC., a North** ) | |
| **Carolina Corporation, registered** ) | |
| **with the Office of the Secretary of State** ) | CV-05-PWG-2119-S |
| **for the State of Alabama, and conducting** ) | |
| **business within the State of Alabama,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT FOR CLASS RELIEF

**COMES NOW**, Individual and Representative Plaintiffs, John Swift, and Bertram Lee

(collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, upon personal

knowledge as to themselves and information and belief as to other matters, state as follows:

### I. NATURE OF THE CASE

1.      This putative plaintiff class action lawsuit is brought by Individual and

Representative Plaintiffs, seeking declaratory, injunctive, and monetary class action relief against

Defendant Pike Electric, Inc., a North Carolina Corporation ("Defendant," "Defendant Pike," or

"Pike"), for engaging in and condoning a continuing pattern and practice of intentional and

systematic race-based discrimination against Individual and Representative Plaintiffs, and all

others similarly situated, in violation of 42 U.S.C. § 1981.

2.      This putative plaintiff class action lawsuit is brought by Individual and

Representative Plaintiffs against Pike on behalf of themselves and any and all current and former

African-American employees of Pike against whom Pike has discriminated against on the basis of race, African-American, regarding the terms and conditions of employment concerning said current or prior African-American employees of Pike.

3.      Pike has intentionally and systematically maintained and continues to intentionally maintain a systematic and/or pervasive policy, practice, and/or custom of discrimination based upon race, African-American, by the following:

(1) denial of employment in Pike's administrative, supervisory, and/or managerial work force regarding Pike's African-American employees in comparison with Pike's Caucasian employees – Pike promotes its qualified African-American employees less frequently than they deserve to be promoted and in comparison to Pike's Caucasian employees;

(2) denial of desirable job assignments to Pike's African-American employees in comparison with Pike's Caucasian employees and/or prior employees;

(3) denial to Pike's African-American administrative, supervisory, and managerial employees the degree of authority required to properly perform their supervisory responsibilities, while giving full delegation of authority to Caucasian employees holding said positions;

(4) denial of career advancement opportunities to African-American employees that are equal to those provided to Caucasian employees, including but not limited to the assignment of special studies and career enhancing projects;

(5) hiring of African-American employees in lower graded jobs and retirement of said individuals at that same or slightly higher grade, while Caucasian employees are hired at lower graded jobs and with career advancement opportunities alleged herein move into administrative, supervisory, and/or managerial graded positions in a short period of time;

2

(6) failure to use the option to fill administrative, supervisory, and/or managerial position vacancies through the use of reassignment of African-American employees as often as with Caucasian employees;

(7) job demotions of Pike's African-American employees in comparison with Pike's Caucasian employees;

(8) employment retention of Pike's African-American employees in comparison with Pike's Caucasian employees;

(9) job transfers and reassignments of Pike's African-American employees in comparison with Pike's Caucasian employees – frequency and types given;

(10) rollbacks of Pike's African-American employees in comparison with Pike's Caucasian employees;

(11) application of sick leave of Pike's African-American employees in comparison with Pike's Caucasian employees;

(12) entirely subjective decision-making policies, practices, and/or customs of Pike's African-American employees in comparison with Pike's Caucasian employees – therefore, said process is unyieldingly susceptible to racial discrimination;

(13) rehiring of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees;

(14) allocation of work load of Pike's African-American employees in comparison with Pike's Caucasian employees;

(15) compensation of Pike's African-American employees in comparison with Pike's Caucasian employees – Pike's African-American employees are paid less money than

3

what is paid to Pike's Caucasian employees who are doing comparable work;

(16) adverse and/or nonexistent job performance evaluations of Pike's African-American employees in comparison with Pike's Caucasian employees – African-American employees of Pike commonly receive average or below-average performance ratings, while Pike's Caucasian employees are more likely to receive average or above-average ratings (because Pike's African-American employees pay and promotion are inextricably tied to their job performance evaluations, Pike's African-American employees receive lower compensation and fewer promotions in comparison to Pike's Caucasian employees);

(17) denial of employment position advancement opportunities of Pike's African-American employees in comparison with Pike's Caucasian employees;

(18) institution of discipline of Pike's African-American employees in comparison with Pike's Caucasian employees;

(19) toleration of a racially hostile working environment toward Pike's African-American employees in comparison with Pike's Caucasian employees;

(20) hazardous job exposure of Pike's African-American employees in comparison with Pike's Caucasian employees;

(21) termination from employment of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees; and/or,

(22) other terms and conditions of employment of Pike's African-American employees in comparison with Pike's Caucasian employees.

4.       This putative plaintiff class action lawsuit seeks an end to Pike's racially discriminatory employment policies, practices, and/or customs, an award of back-pay and front-

4

pay, as well as compensatory damages, punitive damages, and injunctive relief, including rightful place relief for all putative class members.

## II. JURISDICTION AND VENUE

5.      Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because some of the events and omissions that give rise to the claims of Plaintiff Swift occurred in the County of Jefferson, State of Alabama. Further, members of the putative plaintiff class reside in Alabama and throughout the United States.

8.      Pike is a North Carolina corporation licensed to do business in the State of Alabama. Many of the acts complained of occurred in this State and this District and gave rise to the claims alleged.

## III. PARTIES

9.      Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

10.     Defendant Pike is a corporation organized under the laws of the State of North Carolina, with its current Registered Office at 351 Riverside Drive, Mount Airy, North Carolina 27030.

11.     Pike is registered with the Office of the Secretary of State for the State of Alabama.

5

12.     Pike, for all times relevant to this lawsuit, maintains offices and does business in the State of Alabama, in this Judicial District, and in this Judicial Division.

13.     Pike is an Electrical Services Contractor serving utility companies in the eastern and southern United States. Pike claims to be the largest independent electrical contractor in the Eastern United States.

14.     Pike is in the business of what is commonly referenced within its industry as the "T & D Business," which encompasses Utility Transmission and Distribution, or "Line Contracting."

15.     Pike's revenue for the fiscal year 2005 exceed $277.80 million.

16.     Pike has more than 4,800 employees.

17.     Pike is headed by J. Eric Pike, grandson of founder Floyd S. Pike.

18.     Pike's services include, but are not limited, the following: (1) overhead and underground transmission and distribution line construction; (2) storm restoration; (3) right-of-way maintenance; and, (4) fiber-optic installation.

19.     Pike is a corporation doing business in the State of Alabama, and employs at least fifteen (15) persons and otherwise meets the jurisdictional prerequisites of any and all laws applicable to Plaintiffs' individual and representative claims stated herein.

20.     Pike is an employer within the meaning of any and all laws applicable to Plaintiffs' individual and representative claims stated herein.

21.     Pike intentionally recruits, hires, and maintains a disproportionately Caucasian administrative, supervisory, and/or managerial work force who act as recruiters and/or decision-makers regarding other potential  administrative, supervisory, and/or managerial employment

6

positions.

22.     Pike intentionally and systematically refuses to hire and/or promote qualified African-American individuals seeking to acquire and/or desiring to seeking to acquire employment within Pike's administrative, supervisory, and/or managerial work force.

23.     Pike intentionally and systematically discourages and/or attempts to discourage applications from African-American individuals regarding Pike's administrative, supervisory, and/or managerial work force.

24.     Pike intentionally and systematically fails and/or refuses to evaluate, and/or fails and/or refuses to evaluate without regard to racial group identity, Pike's qualified African-American employees; said intentional and systematic failure and/or refusal to evaluate, and/or failure and/or refusal to evaluate without regard to racial group identity, Pike's qualified African-American employees is conducted in furtherance of Pike's intentional, systematic, and racially discriminatory employment policies, practices, and/or customs.

25.     Pike intentionally and systematically terminates the employment of its qualified African-American employees in furtherance of Pike's intentional and racially discriminatory employment policies, practices, and/or customs.

26.     The policies, practices, and/or customs of Pike constitutes an official corporate directive to give preference to Caucasian employees and potential employees, and to racially discriminate against Pike's African-American employees and potential employees.

27.     Plaintiff John Swift ("Plaintiff Swift" or "Mr. Swift") is an adult citizen of the United States, and is currently a resident of Palmetto, Florida; Plaintiff Swift is an African-American male.

7

28.     Plaintiff Swift was employed by Defendant at all times material hereto.

29.     Plaintiff Swift was an employee of Defendant within the meaning of any and all laws applicable to Plaintiff Swift's individual and representative claims stated herein.

30.     Plaintiff Bertram Lee ("Plaintiff Lee" or "Mr. Lee") is an adult citizen of the United States, and is currently a resident of Tampa, Florida; Plaintiff Lee is an African-American male.

31.     Plaintiff Lee was employed by Defendant at all times material hereto.

32.     Plaintiff Lee was an employee of Defendant within the meaning of any and all laws applicable to Plaintiff Lee's individual and representative claims stated herein.

33.     This lawsuit is brought within the state wherein many of the unlawful employment practices were committed, making venue proper under any and all laws applicable to Plaintiffs' individual and representative claims stated herein.

## IV. CLASS ACTION ALLEGATIONS

34.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

35.     Plaintiffs bring this Class Action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of any and all past, present, and future similarly situated African-Americans employed or previously employed by Pike who have been, continue to be, or in the future may be subjected to discrimination on the basis of race by Pike regarding the following:

(1) denial of employment in Pike's administrative, supervisory, and/or managerial work force regarding Pike's African-American employees in comparison with Pike's Caucasian

8

employees – Pike promotes its qualified African-American employees less frequently than they deserve to be promoted and in comparison to Pike's Caucasian employees;

(2) denial of desirable job assignments to Pike's African-American employees in comparison with Pike's Caucasian employees and/or prior employees;

(3) denial to Pike's African-American administrative, supervisory, and managerial employees the degree of authority required to properly perform their supervisory responsibilities, while giving full delegation of authority to Caucasian employees holding said positions;

(4) denial of career advancement opportunities to African-American employees that are equal to those provided to Caucasian employees, including but not limited to the assignment of special studies and career enhancing projects;

(5) hiring of African-American employees in lower graded jobs and retirement of said individuals at that same or slightly higher grade, while Caucasian employees are hired at lower graded jobs and with career advancement opportunities alleged herein move into administrative, supervisory, and/or managerial graded positions in a short period of time;

(6) failure to use the option to fill administrative, supervisory, and/or managerial position vacancies through the use of reassignment of African-American employees as often as with Caucasian employees;

(7) job demotions of Pike's African-American employees in comparison with Pike's Caucasian employees;

(8) employment retention of Pike's African-American employees in comparison with Pike's Caucasian employees;

(9) job transfers and reassignments of Pike's African-American employees in

9

comparison with Pike's Caucasian employees – frequency and types given;

(10) rollbacks of Pike's African-American employees in comparison with Pike's Caucasian employees;

(11) application of sick leave of Pike's African-American employees in comparison with Pike's Caucasian employees;

(12) entirely subjective decision-making policies, practices, and/or customs of Pike's African-American employees in comparison with Pike's Caucasian employees – therefore, said process is unyieldingly susceptible to racial discrimination;

(13) rehiring of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees;

(14) allocation of work load of Pike's African-American employees in comparison with Pike's Caucasian employees;

(15) compensation of Pike's African-American employees in comparison with Pike's Caucasian employees – Pike's African-American employees are paid less money than what is paid to Pike's Caucasian employees who are doing comparable work;

(16) adverse and/or nonexistent job performance evaluations of Pike's African-American employees in comparison with Pike's Caucasian employees – African-American employees of Pike commonly receive average or below-average performance ratings, while Pike's Caucasian employees are more likely to receive average or above-average ratings (because Pike's African-American employees pay and promotion are inextricably tied to their job performance evaluations, Pike's African-American employees receive lower compensation and fewer promotions in comparison to Pike's Caucasian employees);

10

(17) denial of employment position advancement opportunities of Pike's African-American employees in comparison with Pike's Caucasian employees;

(18) institution of discipline of Pike's African-American employees in comparison with Pike's Caucasian employees;

(19) toleration of a racially hostile working environment toward Pike's African-American employees in comparison with Pike's Caucasian employees;

(20) hazardous job exposure of Pike's African-American employees in comparison with Pike's Caucasian employees;

(21) termination from employment of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees; and/or,

(22) other terms and conditions of employment of Pike's African-American employees in comparison with Pike's Caucasian employees.

36.    Plaintiffs are members of the class Plaintiffs seek to represent.

37.    As a result of Pike's intentional and systematic racially discriminatory employment policies, practices, and/or customs discussed above, an unknown number of qualified African-Americans have been adversely affected regarding the terms and conditions of employment discussed above; therefore, although the precise number of qualified African-American employees and/or prior African-American employees who have been and/or will in the future be subjected to said racially discriminatory adverse employment actions by Pike discussed above is currently unknown, said number is far greater than can be feasiblely addressed through joinder.

11

38.     Pike's Damoclean threat, policy, practice, and/or custom of racially discriminatory employment practices alleged herein hangs over Plaintiffs, and the putative class they seek to represent, and is a question of fact common to all members of the putative class.

39.     Pike's racially discriminatory, intentional, and systematic employment policies, practices, and/or customs pervade all aspects of Pike's employment actions.

40.     The members of the class identified herein are so numerous that joinder of all members is impracticable.

41.     The number of potential class members is currently undeterminable, but is certainly larger than can be addressed through joinder.

42.     There are questions of law and fact common to the members of the class Plaintiffs seek to represent, and these questions predominate over any questions affecting only individual members.  Such common questions include: (3) whether Defendant's policies, practices, and/or customs violate 42 U.S.C. § 1981; and, (4) whether compensatory and punitive damages, injunctive relief, and other equitable remedies for the class Plaintiffs seek to represent.

43.     The representative Plaintiffs' claims are typical of the putative class Plaintiffs seek to represent.

44.     The Individual and Representative Plaintiffs will fairly and adequately represent and protect the interests of the members of the class Plaintiffs seek to represent.  The Individual and Representative Plaintiffs have retained Counsel competent and experienced in complex multi-plaintiff actions, employment discrimination litigation, and the intersection thereof.

45.     Class certification is appropriate pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendant has acted and/or refused to act on grounds generally

12

applicable to the class Plaintiffs seek to represent, making appropriate declaratory and injunctive relief to end Defendant's common, uniform, and unfair racially discriminatory employment personnel policies and/or practices.

46.    Class certification is appropriate under Rule 23(a) of the Federal Rules of Civil Procedure under the banner of increased efficiency; the issues in the putative class action that are subject to generalized proof and thus applicable to the putative class as a whole, predominate over those issues that are subject only to individualized proof.

47.    Class certification is also appropriate pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of fact and law predominate over any questions affecting only individual members of the class Plaintiffs seek to represent, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. The members of the class Plaintiffs seek to represent have been or will be damaged and are entitled to recovery as a result of Defendant's common, uniform, and unfair racially discriminatory employment personnel policies and/or practices. Defendant has computerized payroll and employment personnel data that will make calculation of damages for specific class members relatively simple. The propriety and amount of punitive damages are issues common to the class Plaintiffs seek to represent.

48.    Pike has acted or refused to act on grounds generally applicable to Plaintiffs, and the putative class they seek to represent, thereby making appropriate final injunctive relief with respect to the putative class as a whole.

49.    Plaintiffs possess the same interest and have suffered and/or are suffering the same injury as the putative class they seek to represent; a sufficient nexus exists between the

13

claims of Plaints and the claims of the putative class they seek to represent.

50. Plaintiffs have similar, if not identical, claims as the putative class they seek to represent; the issues relevant to the resolution of the claims brought herein by Plaintiffs involve issues that are susceptible to class-wide proof.

51. Plaintiffs' claims share the same essential characteristics as the claims of the putative class they seek to represent.

52. Plaintiffs' claims, and the claims of the putative class they seek to represent, are so inter-related that the interests of the putative class members will be fairly and adequately protected in their absence.

53. Plaintiffs' claims are typical of those among the putative class which they seek to represent, and said Plaintiffs' individual allegations of racial discrimination are fairly traceable to a common, intentional, and systematic example of Pike's general policy, practice, and/or custom of racial discrimination that pervades Pike's workplace.

54. Pike's policies, practices, and/or customs forward a united force, which gives Pikes administrative, supervisory, and managerial employees unfettered discretion to make entirely subjective, non-job related decisions; these common policies, practices and/or customs foster a pattern or practice of discrimination against African-American employees or prior employees based on race, and/or have a disparate impact on African-American employees or prior employees. Representative Plaintiffs seek to redress said alleged wrongdoing in the form of a class action.

55. Pike's intentional and systematic racially discrimination regarding employment is a result of Pike's "Standard Operating Procedure;" there exists a statistically significant disparity

14

among members of different groups affected by a type of Pike's employment decisions.  Said

racial discrimination is Pike's regular rather than unusual practice.  There exists a specific,

facially neutral employment practice regarding the decisions relevant to the allegation against

Pike herein alleged.  There further exists a causal nexus between said facially neutral

employment practice regarding the decisions relevant to the allegation against Pike herein alleged

and the statistically significant disparity.

## V. CLAIMS OF INDIVIDUAL AND REPRESENTATIVE PLAINTIFFS

### A. JOHN SWIFT

56.     Plaintiffs hereby incorporate by reference the foregoing paragraphs of this

Complaint as if fully set forth herein.

57.     On or about August 1, 2004, Mr. Swift was hired by Pike as a Truck Driver; Mr.

Swift initially worked for Pike in this judicial district, State of Alabama, County of Jefferson,

City of Birmingham.

58.     During Mr. Swift's employment with Pike, Mr. Swift observed African-American

employees more commonly given poor job performance evaluations than Pike's Caucasian

employees.

59.     During Mr. Swift's employment with Pike, Mr. Swift observed the failure of Pike

to hire African-American employees consistent with the workforce population.

60.     During Mr. Swift's employment with Pike, Mr. Swift observed the undermining

of the personal and work reputation of Pike's African-American employees by Pike.

61.     During Mr. Swift's employment with Pike, Mr. Swift observed the failure of Pike

to promote African-American employees in comparison with Pike's Caucasian employees.

15

62. During Mr. Swift's employment with Pike, Mr. Swift observed a hostile and racially charged work environment against Pike's African-American employees in comparison with Pike's Caucasian employees.

63. During Mr. Swift's employment with Pike, Mr. Swift observed the harassment, intimidation, degradation, and threatening of Pike's African-American employees by Pike.

64. During Mr. Swift's employment with Pike, Mr. Swift observed Pike's African-American employees more commonly reprimanded and receiving more severe forms of discipline in comparison with Pike's Caucasian employees.

### *1. Mr. Swift's Initial Noticed Encounter with Pike's Intentional and Systematic Policy, Practice, and/or Custom of Subjecting Pike's African-American Employees to Adverse Employment Action Based upon Race, African-American, Regarding the Application and/or Administration of Employee Discipline, the Application and Administration of Employee Job Location Transfers, and Other Terms and Conditions of Employment*

65. Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

66. During November of 2004, while working for Pike in Birmingham, Alabama, Mr. Swift was subjected to adverse and discriminatory employment practices by Pike and/or its agents, employees, or representatives based upon his race, African-American, as follows: Mr. Swift was at work, on a Pike Job Site, engaged in a work-related conversation with two (2) fellow Pike employees and co-workers. At this time, a Caucasian Pike Employee, Bobby Hogan, a Lineman, called Mr. Swift's name to get Mr. Swift's attention. Because Mr. Swift was currently involved in a work-related conversation with said two co-workers, Mr. Swift was unable to respond to Mr. Hogan. Mr. Hogan called Mr. Swift's name again for a second time, so Mr. Swift turned his head toward Mr. Hogan to respond to his concern; however, when Mr. Swift

16

turned his head toward Mr. Hogan, Mr. Hogan was dangling a piece of rope that had a loop and a knot, and could best be described as a "make-shift" Hangman's Noose. Mr. Hogan stated to Mr. Swift: "Come here Swift and let me see if this will fit around your neck, so we can be sure we have the right size." Mr. Hogan then began to laugh at Mr. Swift in a very offending, degrading and humiliating manner. Mr. Hogan's statements and actions toward Mr. Swift on this occasion were racially motivated, and were discriminatory and hostile.

67.     Allen Galloway, a Caucasian Male employed by Pike as a Crew Foreman, was Mr. Swift's Direct-Line Foreman when this incident took place.

68.     Mr. Swift immediately placed Mr. Galloway on notice of Mr. Hogan's actions; Mr. Galloway notified his Supervisor, Credis Whately, a Caucasian Male employed by Pike as General Supervisor.

69.     Mr. Whately then placed his supervisor, Donnie Crowder, a Caucasian Male employed by Pike as Area Supervisor. The next day, Mr. Credis and Mr. Crowder visited the Pike Job Site where Mr. Hogan and Mr. Swift were working.

70.     Mr. Credis and Mr. Crowder had a private discussion first with Mr. Hogan.

71.     After Mr. Credis and Mr. Crowder concluded their private discussion with Mr. Hogan, they then conducted a private discussion with Mr. Swift. Mr. Credis and Mr. Crowder asked Mr. Swift what had happened the day before with Mr. Hogan; therefore, Mr. Swift explained said incident.

72.     Mr. Hogan was not subjected to any disciplinary employment action by Pike in response to his discriminatory conduct and actions directed toward Mr. Swift based upon Mr. Swift's race, African-American.

17

73. The week following the incident with Mr. Hogan discussed above, Pike transferred Mr. Swift's employment to Palmetto, Florida in retaliation for complaining and/or placing on notice Pike Management regarding Mr. Hogan's discriminatory conduct and actions directed toward Mr. Swift discussed above based upon Mr. Swift race, African-American. Due to Mr. Swift's said employment transfer, Mr. Swift and his wife were forced to foreclose on their residence near Birmingham, Alabama, and relocate over five-hundred miles away in Palmetto, Florida.

74. Pike administration, executives, and management knew of and took part in the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in his employment discussed above due to Mr. Swift's race, African-American.

75. Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in Mr. Swift's employment discussed above due to Mr. Swift's race, African-American.

76. Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in Mr. Swift's employment discussed above due to Mr. Swift's race, African-American.

77. Pike administration, executives, and management ratified the racially discriminatory and retaliatory actions discussed above by not taking steps to stop and/or correct same.

78. Pike has a history of racially discriminating and retaliating against African-

18

Americans.

*2. Mr. Swift's Second Noticed Encounter with Pike's Intentional and Systematic Policy, Practice, and/or Custom of Subjecting Pike's African-American Employees to Adverse Employment Action Based upon Race, African-American, Regarding the Application and/or Administration of Employee Discipline, the Application and Administration of Employee Job Location Transfers, and Other Terms and Conditions of Employment*

79.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

80.    On or about November 1, 2004, Mr. Swift was promoted by Pike to Equipment Operator. Said promotion was unrelated to Mr. Swift's employment transfer from Birmingham, Alabama to Palmetto, Florida.

81.    On or about July 10, 2005, Mr. Swift was working at a Pike Job Site in Palmetto, Florida when Mr. Swift was subjected to adverse and discriminatory employment practices by Pike and/or its agents, employees, or representatives based upon Mr. Swift's race, African-American, as follows: A fellow Pike employee and co-worker, Jamie Yarbrough, a Caucasian male employed by Pike as a Lineman, made the following statement to Mr. Swift: "I have to get out from around you Black folk. You attract lightening." Mr. Swift questioned Mr. Yarbrough: "How do you know that?" Mr. Yarbrough replied: "I know that for a fact." Mr. Yarbrough threatened Mr. Swift's life and physical well-being if Mr. Swift decided to report his racially motivated, discriminatory, and hostile statements directed toward Mr. Swift e discussed above, threatening: "If I loose my job I will be sure to put you in the hospital." Mr. Yarbrough further yelled to Mr. Swift: "All you are going to do is bring some more **niggers** over here!" Mr. Yarbrough's statements toward Mr. Swift were racially motivated, and were discriminatory and

19

hostile.

82.     Mr. Swift immediately placed on notice Mr. Swift's Direct-Line Supervisor,

George Thrasher, a Caucasian Male employed by Pike as General Supervisor, of Mr.

Yarbrough's racially motivated, discriminatory and hostile statements discussed above.

83.     Mr. Thrasher took no action on the day of the occurrence of Mr. Yarbrough's

racially motivated, discriminatory and hostile statements discussed above.

84.     Approximately three days after Mr. Yarbrough's racially motivated,

discriminatory and hostile statements discussed above, Bo Lankford, a Caucasian male employed

by Pike as Area Supervisor, visited the Pike Job Site where Mr. Swift was working that day.

85.     Mr. Lankfork conducted a private discussion that day first with Mr. Yarbrough.

86.     Mr. Lankford conducted second a private discussion with Shawn Matthews, an

African-American employed by Pike as Lineman.

87.     Mr. Lankford conducted third a private discussion with John Hayes, an African-

American employed by Pike as Lineman.

88.     Mr. Lankford conducted forth and final a private discussion with Mr. Swift; Mr.

Lankford asked Mr. Swift what had happened three days before with Mr. Yarbrough; therefore,

Mr. Swift explained said incident.

89.     Mr. Yarbrough was not subjected to any disciplinary employment action by Pike

in response to his discriminatory conduct and actions directed toward Mr. Swift based upon Mr.

Swift's race, African-American.

90.     Pike administration, executives, and management knew of and took part in the

racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in his

20

employment discussed above due to Mr. Swift's race, African-American.

91.   Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in Mr. Swift's employment discussed above due to Mr. Swift's race, African-American.

92.   Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in Mr. Swift's employment discussed above due to Mr. Swift's race, African-American.

93.   Pike administration, executives, and management ratified the racially discriminatory and retaliatory actions discussed above by not taking steps to stop and/or correct same.

94.   Pike has a history of racially discriminating and retaliating against African-Americans.

### 3. Mr. Swift's Encounter with Pike's Intentional and Systematic Policy, Practice, and/or Custom of Subjecting Pike's African-American Employees to Adverse Employment Action Based upon Race, African-American, Regarding Employment Evaluations, Opportunity for Title Promotion, Opportunity for Compensation Promotion, and Other Terms and Conditions of Employment

95.   Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

96.   During approximately August of 2005, Mr. Swift was given my three-month evaluation regarding Mr. Swift's employment with Pike; Mr. Thrasher, referenced above, conducted said evaluation. Mr. Thrasher's gave Mr. Swift a negative evaluation; said negative

21

evaluation was racially motivated, was discriminatory against Mr. Swift based upon Mr. Swift's race, African-American, and was done so in retaliation for complaining and/or placing on notice Pike Management regarding Mr. Yarbrough's discriminatory conduct and actions directed toward Mr. Swift discussed above based upon Mr. Swift's race, African-American.

97.     Pike administration, executives, and management knew of and took part in the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in his employment discussed above due to Mr. Swift's race, African-American.

98.     Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in Mr. Swift's employment discussed above due to Mr. Swift's race, African-American.

99.     Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in Mr. Swift's employment discussed above due to Mr. Swift's race, African-American.

100.     Pike administration, executives, and management ratified the racially discriminatory and retaliatory actions discussed above by not taking steps to stop and/or correct same.

101.     Pike has a history of racially discriminating and retaliating against African-Americans.

102.     Mr. Swift is currently preparing for timely filing with the Tampa Area Office of the United States Equal Employment Opportunity Commission ("EEOC") a Charge of

22

Discrimination and Retaliation based upon race, African-American, regarding Pike's adverse racially and retaliatory employment actions taken against Mr. Swift as discussed above.

### 4. Mr. Swift's Encounter with Pike's Intentional and Systematic Policy, Practice, and/or Custom of Subjecting Pike's African-American Employees to Adverse Employment Action Based upon Race, African-American, Regarding the Application and/or Administration of Employee Discipline, Employment Termination, and Other Terms and Conditions of Employment

103.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

104.    Mr. Swift was absent from his employment with Pike from September 26, 2005 through September 30, 2005.

105.    Mr. Swift's September 26, 2005 through September 30, 2005 leave of absence from work was the result of a legitimate and reasonable medical concern regarding Mr. Swift's physical health.

106.    Mr. Swift was under the care of a licensed medical physician for the treatment of said legitimate and reasonable medical concern during the above-referenced time period.

107.    Mr. Swift's treating medical physician ordered Mr. Swift not to work during the above-referenced time period for the benefit of Mr. Swift's health and the individuals who might come into contact with Mr. Swift at work; Mr. Swift's treating physician issued Mr. Swift a valid Doctor's excuse regarding Mr. Swift's absence from work for the above-referenced time period.

108.    Pike was properly and timely placed on notice of Mr. Swift's absence from work for the above-referenced time period.

109.    Pike was properly and timely placed on notice of Mr. Swift's doctor's excuse regarding Mr. Swift's absence from work for the above-referenced time period.

23

110.    Mr. Swift followed all appropriate, applicable, and proper instructions pursuant to
Pike policy, practice and/or custom regarding Mr. Swift's absence from work for the above-
referenced time period.

111.    In an attempt to violate Mr. Swift's privileged Doctor/Patient Confidential
Privilege, the wife of Mr. Swift's direct-line supervisor telephoned Mr. Swift's treating medical
physician regarding Mr. Swift's absence for work for the above-referenced time period, inquiring
about the legitimacy and reasonableness of said leave of absence from employment; said treating
medical physician rightfully and appropriately under law refused to disclose said information
responsive to Mr. Swift's direct-line supervisor's wife's inquiry.

112.    On Monday, October 3, 2005, Mr. Swift returned to work at Pike; on Monday,
October 3, 2005, Mr. Swift was informed by his direct-line supervisor that Mr. Swift's
employment with Pike was immediately terminated due to Mr. Swift's medically supervised,
authorized, and appropriately noticed absence from work for the above-referenced time period.

113.    Mr. Swift's above-referenced termination from employment with Pike was
racially motivated, was discriminatory against Mr. Swift based upon Mr. Swift's race, African-
American, and was done so in retaliation for complaining and/or placing on notice Pike
Management regarding prior discriminatory conduct and actions directed toward Mr. Swift
discussed above based upon Mr. Swift's race, African-American.

114.    Pike administration, executives, and management knew of and took part in the
racially discriminatory and retaliatory conduct which Mr. Swift was subjected to in his
employment termination discussed above due to Mr. Swift's race, African-American.

115.    Pike administration, executives, and management knew of, or should have known

24

under the standard course of care and supervision, of the racially discriminatory and retaliatory

conduct which Mr. Swift was subjected to in Mr. Swift's employment termination discussed

above due to Mr. Swift's race, African-American.

116.    Pike administration, executives, and management knew of, or should have known

under the standard course of care and supervision, of the racially discriminatory and retaliatory

conduct which Mr. Swift was subjected to in Mr. Swift's employment termination discussed

above due to Mr. Swift's race, African-American.

117.    Pike administration, executives, and management ratified the racially

discriminatory and retaliatory actions discussed above by not taking steps to stop and/or correct

same.

118.    Pike has a history of racially discriminating and retaliating against African-

Americans through termination.

119.    Mr. Swift is currently preparing for timely filing with the Tampa Area Office of

the United States Equal Employment Opportunity Commission ("EEOC") a Charge of

Discrimination and Retaliation based upon race, African-American, regarding Pike's adverse

racially and retaliatory employment actions taken against Mr. Swift as discussed above.

### B. BERTRAM LEE

120.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of this

Complaint as if fully set forth herein.

121.    On or about January 15, 2005, Bertram Lee began his employment with Pike as a

Groundman.

122.    Mr. Lee was eventually promoted by Pike to the position of Operator; Mr. Lee

was, sometime thereafter, promoted by Pike to Apprentice Lineman.

123.   Clayton Spoon, a Caucasian male employee of Pike, was Mr. Lee's direct-line supervisor during Mr. Lee's employment with Pike.

124.   During Mr. Lee's employment with Pike, Mr. Lee observed African-American employees more commonly given poor job performance evaluations than Pike's Caucasian employees.

125.   During Mr. Lee's employment with Pike, Mr. Lee observed the failure of Pike to hire African-American employees consistent with the workforce population.

126.   During Mr. Lee's employment with Pike, Mr. Lee observed the undermining of the personal and work reputation of Pike's African-American employees by Pike.

127.   During Mr. Lee's employment with Pike, Mr. Lee observed the failure of Pike to promote African-American employees in comparison with Pike's Caucasian employees.

128.   During Mr. Lee's employment with Pike, Mr. Lee observed a hostile and racially charged work environment against Pike's African-American employees in comparison with Pike's Caucasian employees.

129.   During Mr. Lee's employment with Pike, Mr. Lee observed the harassment, intimidation, degradation, and threatening of Pike's African-American employees by Pike.

130.   During Mr. Lee's employment with Pike, Mr. Lee observed Pike's African-American employees more commonly reprimanded and receiving more severe forms of discipline in comparison with Pike's Caucasian employees.

*1. Mr. Lee's Encounter with Pike's Intentional and Systematic Policy, Practice, and/or Custom of Subjecting Pike's African-American Employees to Adverse Employment Action Based upon Race, African-American, Regarding Employment Evaluations, Opportunity for Title Promotion, Opportunity for Compensation Promotion, and Other Terms and Conditions of Employment*

131. Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

132. Mr. Spoon never subjected Mr. Lee to an employment evaluation, despite Pike's established policy, practice, and/or custom to the contrary; therefore, Mr. Lee was not given the opportunity to earn raises in pay and promotion.

133. Mr. Lee's employment evaluation denials were racially motivated, were discriminatory against Mr. Lee based upon Mr. Lee's race, African-American.

134. Pike administration, executives, and management knew of and took part in the racially discriminatory conduct which Mr. Lee was subjected to in his employment discussed above due to Mr. Lee's race, African-American.

135. Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory conduct which Mr. Lee was subjected to in Mr. Lee's employment discussed above due to Mr. Lee's race, African-American.

136. Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory conduct which Mr. Lee was subjected to in Mr. Lee's employment discussed above due to Mr. Lee's race, African-American.

27

137.    Pike administration, executives, and management ratified the racially

discriminatory actions discussed above by not taking steps to stop and/or correct same.

138.    Pike has a history of racially discriminating against African-Americans regarding

employment evaluations.

139.    Mr. Lee is currently preparing for timely filing with the Tampa Area Office of the

United States Equal Employment Opportunity Commission ("EEOC") a Charge of

Discrimination and Retaliation based upon race, African-American, regarding Pike's adverse

racially and retaliatory employment actions taken against Mr. Swift as discussed above.

### 2. Mr. Lee's Encounter with Pike's Intentional and Systematic Policy, Practice, and/or Custom of Subjecting Pike's African-American Employees to Adverse Employment Action Based upon Race, African-American, Regarding the Application and/or Administration of Employee Discipline, Employment Termination, and Other Terms and Conditions of Employment

140.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of this

Complaint as if fully set forth herein.

141.    On or about July 15, 2005, Mr. Spoon placed Mr. Lee on notice that Mr. Lee's

employment with Pike was terminated effective immediately.

142.    Mr. Lee's employment termination was racially motivated, were discriminatory

against Mr. Lee based upon Mr. Lee's race, African-American.

143.    Pike administration, executives, and management knew of and took part in the

racially discriminatory employment termination which Mr. Lee was subjected to in his

employment discussed above due to Mr. Lee's race, African-American.

144.    Pike administration, executives, and management knew of, or should have known

under the standard course of care and supervision, of the racially discriminatory employment

28

termination which Mr. Lee was subjected to in Mr. Lee's employment discussed above due to Mr. Lee's race, African-American.

145.    Pike administration, executives, and management knew of, or should have known under the standard course of care and supervision, of the racially discriminatory employment termination which Mr. Lee was subjected to in Mr. Lee's employment discussed above due to Mr. Lee's race, African-American.

146.    Pike administration, executives, and management ratified the racially discriminatory employment termination discussed above by not taking steps to stop and/or correct same.

147.    Pike has a history of racially discriminating against African-Americans through termination from employment.

148.    Mr. Swift is currently preparing for timely filing with the Tampa Area Office of the United States Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination and Retaliation based upon race, African-American, regarding Pike's adverse racially and retaliatory employment actions taken against Mr. Swift as discussed above.

## VI. PIKE'S GENERAL POLICIES, PRACTICES, AND/OR CUSTOMS OF DISCRIMINATION OF PIKE'S EMPLOYEES AND/OR PRIOR EMPLOYEES BASED UPON RACE, AFRICAN-AMERICAN

149.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

150.    The denials and abridgments of employment opportunities regarding Pike's African-American employees and/or prior employees concerning the following adverse employment actions suffered and/or subjected upon the Representative Plaintiffs are part of a

29

general and intentional policy, practice, and/or custom of discrimination on the basis of race, African-American, in employment with Pike that has existed at Pike throughout all time relevant to this putative plaintiff class action lawsuit. These are not isolated examples of employment practices and/or individual decisions; on the contrary, these incidents are representative of Pike's intentional and systematic discrimination against African-American employees and/or prior employees, and in favor of Caucasian employees and/or prior employees, to create, administer, and maintain an overwhelmingly Caucasian controlled workforce, and to further and foster Pike's intentionally and racially discriminatory motives which are adverse to African-Americans.

151.    The under-representation of African-Americans within Pike's administrative, supervisory, and/or managerial work force is the result of a intentional and systematic policy, practice, and/or custom of discrimination on the basis of race, African-American, in hiring, initial job assignment, promotion, job evaluation, internal job transfer, discipline, and termination.

152.    Pike has pursued intentional and systematic policies, practices, and/or customs on a continued basis that have denied or restricted job opportunities to qualified African-American applicants and/or employees; such racially discriminatory policies, practices, and/or customs include, but are not limited to, the following:

A.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding, hiring, initial job assignment, promotion, job evaluation, internal job transfer, discipline, and termination – Pike promotes its qualified African-American employees less frequently than they deserve to be promoted and in comparison to Pike's Caucasian employees;

B.    Pike's targeting Caucasian employment candidates for recruitment,

30

internal transfer, and/or promotion, both intentionally and systematically, but avoiding, ignoring, discouraging, harassing and/or dissuading equally or more qualified African-Americans from applying for positions within Pike's administrative, supervisory, and/or managerial work force;

C.      Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the denial of desirable job assignments to qualified African-American employees and/or prior employees – denial of desirable job assignments to Pike's African-American employees in comparison with Pike's Caucasian employees and/or prior employees;

D.      Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the to Pike's African-American administrative, supervisory, and managerial employees the degree of authority required to properly perform their supervisory responsibilities, while giving full delegation of authority to Caucasian employees holding said positions;

E.      Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the denial of career advancement opportunities to African-American employees that are equal to those provided to Caucasian employees, including but not limited to the assignment of special studies and career enhancing projects;

F.      Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the hiring of African-American employees in lower graded jobs and retirement of said individuals at that same or slightly higher grade, while Caucasian employees are hired at lower graded jobs and with

31

career advancement opportunities alleged herein move into administrative, supervisory, and/or managerial graded positions in a short period of time;

G.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the failure to use the option to fill administrative, supervisory, and/or managerial position vacancies through the use of reassignment of African-American employees as often as with Caucasian employees;

H.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding job demotions of Pike's African-American employees in comparison with Pike's Caucasian employees;

I.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the employment retention of Pike's African-American employees in comparison with Pike's Caucasian employees;

J.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding job transfers and reassignments of Pike's African-American employees in comparison with Pike's Caucasian employees – frequency and types given;

K.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding rollbacks of Pike's African-American employees in comparison with Pike's Caucasian employees;

L.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding application of

32

sick leave of Pike's African-American employees in comparison with Pike's Caucasian employees;

      M.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding entirely subjective decision-making policies, practices, and/or customs of Pike's African-American employees in comparison with Pike's Caucasian employees – therefore, said process is unyieldingly susceptible to racial discrimination;

      N.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding rehiring of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees;

      O.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding allocation of work load of Pike's African-American employees in comparison with Pike's Caucasian employees;

      P.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding compensation of Pike's African-American employees in comparison with Pike's Caucasian employees – Pike's African-American employees are paid less money than what is paid to Pike's Caucasian employees who are doing comparable work;

      Q.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the adverse

33

and/or nonexistent job performance evaluations of Pike's African-American employees in comparison with Pike's Caucasian employees – African-American employees of Pike commonly receive average or below-average performance ratings, while Pike's Caucasian employees are more likely to receive average or above-average ratings (because Pike's African-American employees pay and promotion are inextricably tied to their job performance evaluations, Pike's African-American employees receive lower compensation and fewer promotions in comparison to Pike's Caucasian employees);

R.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the denial of employment position advancement opportunities of Pike's African-American employees in comparison with Pike's Caucasian employees;

S.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the institution of discipline of Pike's African-American employees in comparison with Pike's Caucasian employees;

T.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the toleration of a racially hostile working environment toward Pike's African-American employees in comparison with Pike's treatment of Caucasian employees;

U.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the hazardous job exposure of Pike's African-American employees in comparison with Pike's Caucasian

34

employees;

    V.     Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding the termination from employment of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees; and/or,

    W.    Pike's intentional and systematic reliance on entirely subjective, arbitrary, standardless, and unvalidated criteria in making employment decisions regarding other terms and conditions of employment of Pike's African-American employees in comparison with Pike's Caucasian employees.

## VII. CLAIMS

## A. COUNT ONE

## RACE DISCRIMINATION – 42 U.S.C. § 1981

153.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

154.    This claim is brought on behalf of all Representative Plaintiffs and the Putative Class they represent.

155.    Pike has intentionally and systematically maintained and continues to intentionally maintain a systematic and/or pervasive policy, practice, and/or custom of discrimination based upon race, African-American, by the following:

(1) denial of employment in Pike's administrative, supervisory, and/or managerial work force regarding Pike's African-American employees in comparison with Pike's Caucasian employees – Pike promotes its qualified African-American employees less frequently than they

35

deserve to be promoted and in comparison to Pike's Caucasian employees;

(2) denial of desirable job assignments to Pike's African-American employees in comparison with Pike's Caucasian employees and/or prior employees;

(3) denial to Pike's African-American administrative, supervisory, and managerial employees the degree of authority required to properly perform their supervisory responsibilities, while giving full delegation of authority to Caucasian employees holding said positions;

(4) denial of career advancement opportunities to African-American employees that are equal to those provided to Caucasian employees, including but not limited to the assignment of special studies and career enhancing projects;

(5) hiring of African-American employees in lower graded jobs and retirement of said individuals at that same or slightly higher grade, while Caucasian employees are hired at lower graded jobs and with career advancement opportunities alleged herein move into administrative, supervisory, and/or managerial graded positions in a short period of time;

(6) failure to use the option to fill administrative, supervisory, and/or managerial position vacancies through the use of reassignment of African-American employees as often as with Caucasian employees;

(7) job demotions of Pike's African-American employees in comparison with Pike's Caucasian employees;

(8) employment retention of Pike's African-American employees in comparison with Pike's Caucasian employees;

(9) job transfers and reassignments of Pike's African-American employees in comparison with Pike's Caucasian employees – frequency and types given;

36

(10) rollbacks of Pike's African-American employees in comparison with Pike's Caucasian employees;

(11) application of sick leave of Pike's African-American employees in comparison with Pike's Caucasian employees;

(12) entirely subjective decision-making policies, practices, and/or customs of Pike's African-American employees in comparison with Pike's Caucasian employees – therefore, said process is unyieldingly susceptible to racial discrimination;

(13) rehiring of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees;

(14) allocation of work load of Pike's African-American employees in comparison with Pike's Caucasian employees;

(15) compensation of Pike's African-American employees in comparison with Pike's Caucasian employees – Pike's African-American employees are paid less money than what is paid to Pike's Caucasian employees who are doing comparable work;

(16) adverse and/or nonexistent job performance evaluations of Pike's African-American employees in comparison with Pike's Caucasian employees – African-American employees of Pike commonly receive average or below-average performance ratings, while Pike's Caucasian employees are more likely to receive average or above-average ratings (because Pike's African-American employees pay and promotion are inextricably tied to their job performance evaluations, Pike's African-American employees receive lower compensation and fewer promotions in comparison to Pike's Caucasian employees);

(17) denial of employment position advancement opportunities of Pike's African-

37

American employees in comparison with Pike's Caucasian employees;

(18) institution of discipline of Pike's African-American employees in comparison with Pike's Caucasian employees;

(19) toleration of a racially hostile working environment toward Pike's African-American employees in comparison with Pike's Caucasian employees;

(20) hazardous job exposure of Pike's African-American employees in comparison with Pike's Caucasian employees;

(21) termination from employment of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees; and/or,

(22) other terms and conditions of employment of Pike's African-American employees in comparison with Pike's Caucasian employees.

156.    The forgoing conduct constitutes illegal, intentional, and systematic discrimination on the basis of race, African-American, with respect to the making, performance, internal transfer, application of employee discipline, modification, and termination of employment prohibited by 42 U.S.C. § 1981.

157.    Similarly situated Caucasian employees were not treated in a similar fashion as the Representative Plaintiffs and the putative class they represent.

158.    Pike's actions were taken with malice or reckless indifference to the federally protected rights of the Representative Plaintiffs and the putative class they represent.

159.    Defendants exercise a pattern or practice of racial discrimination.

160.    Plaintiffs request relief as hereinafter provided.

38

## B. COUNT TWO

## DISCRIMINATORY RETALIATION – 42 U.S.C. § 1981

161.    Plaintiffs hereby incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

162.    This claim is brought on behalf of all Representative Plaintiffs and the Putative Class they represent.

163.    Plaintiffs and the putative class they seek to represent have been intentionally and systematically retaliated against for voicing their concerns  to Pike's supervisory/management personnel regarding the racial motivated discriminatory treatment in violation of 42 U.S.C. § 1981 based on the following:

A.    Plaintiffs and the putative class they seek to represent were and/or are subjected to racially discriminatory retaliation regarding the terms and conditions of employment with Pike.

B.    Plaintiffs and the putative class they seek to represent were and/or are held to a higher standard than other similarly situated white employees, and have different work rules imposed upon them.

164.    Pike has intentionally and systematically maintained and continues to intentionally maintain a systematic and/or pervasive policy, practice, and/or custom of discriminatory retaliation based upon race, African-American, by the following:

(1) denial of employment in Pike's administrative, supervisory, and/or managerial work force regarding Pike's African-American employees in comparison with Pike's Caucasian employees – Pike promotes its qualified African-American employees less frequently than they

39

deserve to be promoted and in comparison to Pike's Caucasian employees;

(2) denial of desirable job assignments to Pike's African-American employees in comparison with Pike's Caucasian employees and/or prior employees;

(3) denial to Pike's African-American administrative, supervisory, and managerial employees the degree of authority required to properly perform their supervisory responsibilities, while giving full delegation of authority to Caucasian employees holding said positions;

(4) denial of career advancement opportunities to African-American employees that are equal to those provided to Caucasian employees, including but not limited to the assignment of special studies and career enhancing projects;

(5) hiring of African-American employees in lower graded jobs and retirement of said individuals at that same or slightly higher grade, while Caucasian employees are hired at lower graded jobs and with career advancement opportunities alleged herein move into administrative, supervisory, and/or managerial graded positions in a short period of time;

(6) failure to use the option to fill administrative, supervisory, and/or managerial position vacancies through the use of reassignment of African-American employees as often as with Caucasian employees;

(7) job demotions of Pike's African-American employees in comparison with Pike's Caucasian employees;

(8) employment retention of Pike's African-American employees in comparison with Pike's Caucasian employees;

(9) job transfers and reassignments of Pike's African-American employees in comparison with Pike's Caucasian employees – frequency and types given;

40

(10) rollbacks of Pike's African-American employees in comparison with Pike's Caucasian employees;

(11) application of sick leave of Pike's African-American employees in comparison with Pike's Caucasian employees;

(12) entirely subjective decision-making policies, practices, and/or customs of Pike's African-American employees in comparison with Pike's Caucasian employees – therefore, said process is unyieldingly susceptible to racial discrimination;

(13) rehiring of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees;

(14) allocation of work load of Pike's African-American employees in comparison with Pike's Caucasian employees;

(15) compensation of Pike's African-American employees in comparison with Pike's Caucasian employees – Pike's African-American employees are paid less money than what is paid to Pike's Caucasian employees who are doing comparable work;

(16) adverse and/or nonexistent job performance evaluations of Pike's African-American employees in comparison with Pike's Caucasian employees – African-American employees of Pike commonly receive average or below-average performance ratings, while Pike's Caucasian employees are more likely to receive average or above-average ratings (because Pike's African-American employees pay and promotion are inextricably tied to their job performance evaluations, Pike's African-American employees receive lower compensation and fewer promotions in comparison to Pike's Caucasian employees);

(17) denial of employment position advancement opportunities of Pike's African-

41

American employees in comparison with Pike's Caucasian employees;

(18) institution of discipline of Pike's African-American employees in comparison with Pike's Caucasian employees;

(19) toleration of a racially hostile working environment toward Pike's African-American employees in comparison with Pike's Caucasian employees;

(20) hazardous job exposure of Pike's African-American employees in comparison with Pike's Caucasian employees;

(21) termination from employment of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees; and/or,

(22) other terms and conditions of employment of Pike's African-American employees in comparison with Pike's Caucasian employees.

165.   The forgoing conduct constitutes illegal, intentional, and systematic discriminatory retaliation on the basis of race, African-American, with respect to the making, performance, internal transfer, application of employee discipline, modification, and termination of employment prohibited by 42 U.S.C. § 1981.

166.   Similarly situated Caucasian employees of Pike were not treated in a similar fashion as the Representative Plaintiffs and the putative class they represent.

167.   Pike's actions were taken with malice or reckless indifference to the federally protected rights of Plaintiffs and the putative class they represent.

168.   Pike exercises an intentional and systematic pattern or practice of discriminatory retaliation on the basis of race, African-American..

169.   Plaintiffs request relief as hereinafter provided.

42

170.    Pike's racially retaliatory actions were taken with malice or reckless indifference to the federally protected rights of Plaintiffs and the putative class they seek to represent.

## C. NOTICE OF FUTURE THIRD CLAIM

### RACE DISCRIMINATION – 42 U.S.C. § 2000e, *et seq.*

180.    Plaintiff hereby incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

181.    Pike has intentionally and systematically maintained and continues to intentionally maintain a systematic and/or pervasive policy, practice, and/or custom of discrimination based upon race, African-American, by the following:

(1) denial of employment in Pike's administrative, supervisory, and/or managerial work force regarding Pike's African-American employees in comparison with Pike's Caucasian employees – Pike promotes its qualified African-American employees less frequently than they deserve to be promoted and in comparison to Pike's Caucasian employees;

(2) denial of desirable job assignments to Pike's African-American employees in comparison with Pike's Caucasian employees and/or prior employees;

(3) denial to Pike's African-American administrative, supervisory, and managerial employees the degree of authority required to properly perform their supervisory responsibilities, while giving full delegation of authority to Caucasian employees holding said positions;

(4) denial of career advancement opportunities to African-American employees that are equal to those provided to Caucasian employees, including but not limited to the assignment of special studies and career enhancing projects;

(5) hiring of African-American employees in lower graded jobs and retirement of

43

said individuals at that same or slightly higher grade, while Caucasian employees are hired at lower graded jobs and with career advancement opportunities alleged herein move into administrative, supervisory, and/or managerial graded positions in a short period of time;

(6) failure to use the option to fill administrative, supervisory, and/or managerial position vacancies through the use of reassignment of African-American employees as often as with Caucasian employees;

(7) job demotions of Pike's African-American employees in comparison with Pike's Caucasian employees;

(8) employment retention of Pike's African-American employees in comparison with Pike's Caucasian employees;

(9) job transfers and reassignments of Pike's African-American employees in comparison with Pike's Caucasian employees – frequency and types given;

(10) rollbacks of Pike's African-American employees in comparison with Pike's Caucasian employees;

(11) application of sick leave of Pike's African-American employees in comparison with Pike's Caucasian employees;

(12) entirely subjective decision-making policies, practices, and/or customs of Pike's African-American employees in comparison with Pike's Caucasian employees – therefore, said process is unyieldingly susceptible to racial discrimination;

(13) rehiring of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees;

(14) allocation of work load of Pike's African-American employees in

44

comparison with Pike's Caucasian employees;

(15) compensation of Pike's African-American employees in comparison with Pike's Caucasian employees – Pike's African-American employees are paid less money than what is paid to Pike's Caucasian employees who are doing comparable work;

(16) adverse and/or nonexistent job performance evaluations of Pike's African-American employees in comparison with Pike's Caucasian employees – African-American employees of Pike commonly receive average or below-average performance ratings, while Pike's Caucasian employees are more likely to receive average or above-average ratings (because Pike's African-American employees pay and promotion are inextricably tied to their job performance evaluations, Pike's African-American employees receive lower compensation and fewer promotions in comparison to Pike's Caucasian employees);

(17) denial of employment position advancement opportunities of Pike's African-American employees in comparison with Pike's Caucasian employees;

(18) institution of discipline of Pike's African-American employees in comparison with Pike's Caucasian employees;

(19) toleration of a racially hostile working environment toward Pike's African-American employees in comparison with Pike's Caucasian employees;

(20) hazardous job exposure of Pike's African-American employees in comparison with Pike's Caucasian employees;

(21) termination from employment of Pike's African-American employees and/or prior employees in comparison with Pike's Caucasian employees and/or prior employees; and/or,

(22) other terms and conditions of employment of Pike's African-American

45

employees in comparison with Pike's Caucasian employees.

182.    The result of said unmerited, illegal, intentional, and systematic denials has resulted in the loss of past, present, and future wages and other job benefits.

183.    The forgoing conduct constitutes illegal, intentional, and systematic discrimination on the basis of race, African-American, with respect to the making, performance, internal transfer, application of employee discipline, modification, and termination of employment prohibited by 42 U.S.C. § 2000e, *et seq.*

184.    Similarly situated Caucasian employees were not treated in a similar fashion as Plaintiffs and the putative class they seek to represent.

185.    Pike's actions were taken with malice or reckless indifference to the federally protected rights of Plaintiffs and the putative class they seek to represent.

186.    Pike intentionally and systematically engages in a pattern or practice of racial discrimination.

187.    Plaintiffs request relief as hereinafter provided.

## VIII. ALLEGATIONS REGARDING RELIEF

188.    Plaintiffs, and the putative class they seek to represent, have no plain, adequate, or complete remedy at law to redress Pike's wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.

189.    Plaintiffs, and the putative class they seek to represent, are now suffering and will continue to suffer irreparable injury from Pike's racially discriminatory employment acts and/or omissions.

190.    Pike's actions discussed above have caused and will continue to cause Plaintiffs,

46

and the putative class they seek to represent, substantial losses in earnings, work experience, and other employment benefits.

191.    Plaintiffs, and the putative class they seek to represent, have suffered and will continue to suffer humiliation, embarrassment, degradation, and anguish, all to their damage in an amount according to proof.

192.    Pike performed the intentional and systematic racially discriminatory acts herein alleged with malice and/or reckless indifference; Plaintiff, and the putative class they seek to represent, are thus entitled to recover punitive damages in an amount according to proof.

## IX. PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs, and the putative class they seek to represent, respectfully requests that this Honorable Court grant the following relief:

A.    Certification of the case as a class action on behalf of the class;

B.    Designation of Representative Plaintiffs John Swift and Bertram Lee as representative of the class;

C.    Designation of Representative Plaintiffs' Counsel of Record as Class Counsel;

D.    A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. § 1981;

E.    A preliminary and permanent injunction against Pike and its officers, agents, successors, employees, representatives, and any and all individuals and/or entities acting in concert with them, from engaging in each of the unlawful, intentional, and systematic policies, practices, and/or customs, and usages set forth herein;

47

F.     A Judicial Order that Pike institute and carry out policies, practices, and/or programs that provide and promote equal employment opportunities for all African-American employees and/or future employees, and that Pike eradicate the effects of its past, present, and future unlawful, intentional, and racially discriminatory employment policies, practices, and/or customs;

G.     A Judicial Order that Pike institute and carry out policies, practices, and/or programs that provide and promote equal employment opportunities for all African-American employees and/or future employees, and that Pike eradicate the effects of its past, present, and future unlawful, intentional, and racially discriminatory employment policies, practices, and/or customs;

H.     A Judicial Order restoring Plaintiffs, and the class they seek to represent, to their rightful positions at Pike, or in lieu of reinstatements, a Judicial Order for front pay benefits; that Pike institute and carry out policies, practices, and/or programs that provide and promote equal employment opportunities for all African-American employees and/or future employees, and that Pike eradicate the effects of its past, present, and future unlawful, intentional, and racially discriminatory employment policies, practices, and/or customs;

I.     Back pay (including but not limited to interest and benefits) for Plaintiffs, and the class they seek to represent;

J.     All damages sustained as a direct and proximate result and consequence of Pike's conduct alleged herein, including but not limited to damages for emotional distress, humiliation, degradation, embarrassment, and anguish, according to proof;

K.     Exemplary and punitive damages in an amount commensurate with Pike's

48

ability to pay and to deter similar future conduct;

        L.     Costs incurred herein, including but not limited to reasonable attorneys'

fees to the extent allowable by law;

        M.     Pre-judgment and post-judgment interest, as provided by law; and,

        N.     Such other and further legal and equitable relief as this Honorable Court

deems necessary, just, and proper.

Respectfully submitted,

Coker B. Cleveland (CLE-040)
Attorney for Plaintiffs
John Swift & Bertram Lee

**OF COUNSEL:**

CLEVELAND & VICKERS, LLC
Colonial Plaza Building
2101 Sixth Avenue North
Suite 115
Birmingham, Alabama 35203
Telephone: 205.328.1217
Facsimile: 205.328.9184
Email: cbc@cvlaw1.com

49

**PLAINTIFFS DEMAND TRIAL BY STRUCK JURY**

OF COUNSEL

**PLAINTIFFS' ADDRESSES:**

John Swift
1060 North West 67th Place
Ocala, Florida 34475

Bertram Lee
1909 North A
Tampa, Florida 33606

**Please Serve the Following by Certified Mail,
Return Receipt Requested:**

Pike Electric, Inc.
C/O The Corporation Company
Registered Agent
2000 Interstate Park Drive
Suite 204
Montgomery, Alabama 36109